## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **CYNTHIA J. GONZALES,** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:25-cv-1358** |
| | § | |
| **CORGAN ASSOCIATES, INC.,** | § | **JURY TRIAL DEMANDED** |
| | § | |
| *Defendant*. | § | |

---

## PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

---

Plaintiff Cynthia J. Gonzales  files this Original Complaint and Jury Demand against her former employer, Defendant Corgan Associates, Inc. ("Corgan" or "Defendant") (together with Ms. Gonzales, the "Parties"), for violations of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991 ("Title VII"), 42 U.S.C. §§ 2000e *et seq*.; the Pregnant Workers Fairness Act (the "PWFA"), 42 U.S.C. §§ 2000gg *et seq*.; the Texas Employment Discrimination Act, as amended, Tex. Lab. Code §§ 21.001 *et seq*. ("TLC"), and any other cause of action to be inferred or established by the facts set forth herein.  In support of her claims and right to recovery against Corgan, Ms. Gonzales would respectfully show the Court as follows:

## PRELIMINARY STATEMENT

1.    This action arises from Corgan's unlawful termination of Ms. Gonzales just days after she disclosed her pregnancy to HR. Before her disclosure, Ms. Gonzales excelled as Marketing Coordinator, earning commendations, positive reviews, and a department award. Within days of announcing her pregnancy in August 2023, Corgan disciplined Ms. Gonzales and terminated her one week later for a two-minute tardiness—while continuing to allow male and non-pregnant employees flexibility in their schedules. Corgan's stated reasons are inconsistent with company policies, contradicted by Ms. Gonzales's performance record, and reveal stark disparate treatment compared to similarly situated employees.

## PARTIES

2.    Ms. Gonzales is an individual residing in Dallas County, Texas.

3.    Corgan is a for-profit Texas corporation headquartered in Dallas County, at 401 North Houston Street, Dallas, Texas 75202—where Corgan employed Ms. Gonzales at all relevant times, and where upon information and belief, Corgan maintains Ms. Gonzales's employment records.

4.    Corgan may be served through its registered agent, Stephanie D. Garcia, at 401 North Houston Street, Dallas, Texas 75202.

## JURISDICTION AND VENUE

5.    The Court has federal question jurisdiction under 28 U.S.C. § 1331 because Ms. Gonzales's causes of action arise under Title VII and the Pregnant Workers Fairness Act.    42 U.S.C. § 2000e-5(f)(3); 42 U.S.C. § 2000gg-2(a)(1). The Court also has supplemental jurisdiction under 28 U.S.C. § 1367(a) over

Ms. Gonzales's state law claims, which are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the Constitution.

6.    The Court has personal jurisdiction over Corgan, a Texas corporation headquartered in Texas, who employed Ms. Gonzales in Dallas at all relevant times.

7.    Venue exists in this district and division as detailed in 28 U.S.C. § 1391. Specifically, venue is proper in the United States District Court for the Northern District of Texas, Dallas Division, pursuant to 42 U.S.C. §§ 1391(b), because the unlawful practices alleged were committed here and because Corgan maintains offices, conducts business, and resides here.

## **EXHAUSTION OF FEDERAL ADMINISTRATIVE REMEDIES**

8.    Within 180 days of the adverse actions complained of in this action, Ms. Gonzales timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), which constitutes a cross-filing with the Texas Workforce Commission, Civil Rights Division.  A copy of Ms. Gonzales's EEOC charge against Corgan—to which she attached a detailed, sworn declaration in support (the "Declaration")—is attached hereto as Exhibit A.

9.    A duplicate charge was also submitted to the Texas Workforce Commission on the same day, who confirmed their receipt of Ms. Gonzales's charge and who later dismissed the case upon receiving instructions from the EEOC's Dallas District Office to that effect.  The TWC's notice of dismissal, attached hereto as Exhibit B did not include anything to the effect the notice providing Ms. Gonzales with a right to sue.

10.    On March 3, 2025, the EEOC issued its Right to Sue Notice to Ms. Gonzales (the "Right to Sue Notice"), a copy of which is attached hereto as Exhibit C, reflecting that Gonzales has timely filed this Complaint within 90 days of its issuance.  And, although the TWC did not issue a right to sue letter in this case, this Complaint is timely under her state-law claims because it is being filed within two years of Ms. Gonzales's submission of her charge to the TWC, as permitted under Tex. Lab. Code § 21.256.

## STATEMENT OF FACTS

11.    Ms. Gonzales is a woman who was employed by Corgan in Dallas, Texas, for approximately one year, from around September 2022 until her termination on August 22, 2023.  When Ms. Gonzales joined Corgan, she had two children, with her youngest child being just one year old.  In support of the foregoing and following allegations, the attached and aforementioned Declaration is hereby expressly incorporated into this Complaint by reference—as if each factual allegation, paragraph, heading in the Declaration were set forth fully herein.  *See* Ex. A, Declaration ¶¶ 1–88; *see also supra* ¶ 8.

12.    Before joining Corgan, Ms. Gonzales had established herself as a skilled senior marketing manager in the commercial construction and design industries, where her work consistently strengthened proposals and elevated brand visibility. Her depth of experience in that space positioned her for continued career advancement, and Corgan expressed particular interest in her during the hiring process based on her established track record of producing quality proposal and branding work that aligned with the firm's needs and industry.

13.    Before accepting Corgan's offer, Ms. Gonzales met with senior marketing leadership, who assured her she could work an adjusted schedule to allow for school pickup and to continue working from home.  During that meeting and in her prior discussions with Corgan, the company noted that such flexibility was regularly extended for less pressing needs, such as pet care. Coupled with Corgan's office being closer to Ms. Gonzales's home, Corgan's emphasis on flexibility and being a family-friendly workplace ultimately led her to choose Corgan over a higher-paying offer to work for another firm in the industry.

## CORGAN'S FLEXIBLE WORK POLICY

14.    Corgan's "Flexible Work Environment" policy (the "FWE Policy") allowed employees flexibility with respect to their workday. While the Dallas office was officially open from 8:00 a.m. to 5:00 p.m., Monday through Friday, the FWE Policy required only that employees (a) be available—whether in person or remote—during the "core hours" of 9:00 a.m. to 4:00 p.m., and (b) work a total of eight hours each day.

15.    Corgan's written FWE Policy expressly stated that these eight daily work hours did not need to be contiguous, and further provided that the policy "allows employees to vary their working hours, without approval, as long as these times are inclusive of core hours."

16.    The FWE Policy also expressly acknowledged and sought to accommodate the "need or desire" of employees "to work from a location other than the office for all or part of a day," subject to certain general expectations and guidelines. While the office was identified as the default work location, employees

were expected to exercise judgment based on workload, collaboration needs, and task mix, and their remote-work privileges could likewise be limited in the discretion of their managers.  Employees were also required to coordinate with their manager "in advance," though the policy did not specify what amount of notice would be sufficient.

### CORGAN IMPLEMENTS THE FWE POLICY THROUGH EMPLOYEE DISCRETION AND SAME-DAY ANNOUNCEMENTS IN DEDICATED MESSAGING CHANNELS

17.     Corgan's FWE Policy set out guiding principles around core hour availability, coordination, and manager discretion, and those principles were applied through well-established practices in the Marketing Department and the company generally.  These practices were used consistently by both employees and supervisors and were accepted as consistent with the flexibility contemplated by the policy.

18.     With respect to the requirement that daily working hours include core hours, for example, it was broadly understood—and never meaningfully questioned— that employees were free to step away from their desks during core hours to, for example, grab lunch or handle short personal errands.

19.     With respect to advance notice and coordination of remote work, the Marketing Department maintained a Microsoft Teams work-from-home chat (the "WFH Chat") where employees would give same-day notice of when they planned to work from home or be out of the office for part of the day.

20.     On a typical day, the WFH Chat would contain between 10 and 30 posts, which generally consisted of same-day announcements of plans to work from home or be unavailable for some period during the core hours of 9:00 a.m. to 4:00 p.m.

21.    Although posts in the WFH Chat often referenced family or home responsibilities, Corgan's flexible work policy was not limited to such situations. Employees frequently announced in the WFH Chat that they would be out of the office or unavailable for nonessential reasons during core hours—such as for hair appointments or pet grooming.

22.    Ms. Gonzales's supervisors did not raise concerns about the routine use of the FWE Policy by employees, nor did they object to same-day notices about plans to work remotely or adjust their hours. To the contrary, Ms. Gonzales's supervisors took full advantage of the FWE Policy, as was standard within the Marketing Department and the company in general. Additionally, nearly everyone in Ms. Gonzales's department—including those with the same title and responsibilities as Ms. Gonzales and Marketing Department supervisors in the Dallas office—worked from home on Fridays as a matter of course.

23.    Ms. Gonzales's supervisors did not discourage her from working from home, and no concerns were raised by her supervisors, Marketing Department colleagues, or Human Resources regarding her schedule or occasional remote work during the early and middle portions of her tenure. Until she disclosed her pregnancy to Corgan's HR department, the only expectations communicated to Ms. Gonzales related to the FWE Policy came during a May 2023 conversation with one of her supervisors, who expressly told her that the discussion was not disciplinary in nature. In that conversation, Ms. Gonzales was advised to be present in the office on project deadline days—guidance she followed for the remainder of her time at Corgan.

**CORGAN CONSISTENTLY REWARDS AND RECOGNIZES MS. GONZALES'S PERFORMANCE AND CONTRIBUTIONS TO THE WORKPLACE**

24. Throughout Ms. Gonzales's employment, Corgan regularly recognized her performance and contributions.

25. Following her first mid-year performance review, Ms. Gonzales received a $100 bonus and a handwritten note from her direct supervisor, Brittany Knoll, stating that Ms. Gonzales had "already proven to be such a valuable asset to this team."

26. Approximately six months later, in late March 2023, Ms. Gonzales received a merit-based salary increase of $1,500 and a $2,000 bonus after her annual performance review. That review included a handwritten note from Brittany that read, "Thanks for all you do!" and made no mention of any performance deficiencies. To the contrary, Ms. Gonzales's annual performance review made clear that she was meeting Corgan's expectations for her role.

27. Beyond the formal review process, Corgan further recognized Ms. Gonzales's contributions in late July 2023 by awarding her the "Heart of Gold Award" for her "constant encouragement of the team" and a demeanor that "embodies selflessness." This accolade was based on votes from colleagues in both the Dallas and Houston Corgan offices and reflected recognition of her being a reliable teammate, exceeding expectations, and providing meaningful contributions to the Marketing Department.

**MS. GONZALES GETS PREGNANT AND DISCLOSES HER PREGNANCY TO CORGAN**

28.    In June 2023, Ms. Gonzales learned that she was pregnant with her third child.  Although she had hoped to wait until she was further along, Ms. Gonzales excitedly shared the news with a close colleague shortly after learning it. In doing so, she also disclosed her pregnancy to a sector manager, Rachael Anderson, whose desk was nearby and who joined the conversation just in time for the news. Both colleagues responded with enthusiasm and congratulated her.

29.    As is common during a third pregnancy, Ms. Gonzales began to show visibly around the three-month mark, around July 2023.  And by August 2023, around the four-month mark, Ms. Gonzales's pregnancy was readily apparent:

 

*Photos of Ms. Gonzales and family, taken on or around August 19, 2023, less than two weeks after disclosing her pregnancy to the company's Human Resources Director, and three days before Corgan terminated her employment.*

30.    Ms. Gonzales disclosed her pregnancy to Corgan's Human Resources Director the week of August 7, 2023, over a phone call.  What prompted the call was

Ms. Gonzales overhearing a conversation between Rachael Anderson (*i.e.*, the sector manager Ms. Gonzales had initially told of her pregnancy in June) and Brittany Knoll (*i.e.*, Ms. Gonzales's formally assigned direct supervisor).

31.     In the conversation overheard by Ms. Gonzales, Rachael referenced an email she and Ms. Gonzales had been copied on the night before and remarked that Ms. Gonzales took several hours to send back the requested edits.  The tenor of the conversation gave Ms. Gonzales the impression that her same-night response to an after-hours request was being unfairly considered as a sign of poor responsiveness while working remotely.

32.     In raising her concerns about this conversation with HR, Ms. Gonzales disclosed that she was pregnant and that her concerns about the tone and expectations implied in Brittany's exchange with Rachael carried significantly greater weight in light of her pregnancy.  She also told Halima that her pregnancy meant that she would require more flexibility with respect to her work hours.

33.     Rather than addressing Ms. Gonzales's concerns, Halima sidestepped them, offering only a quick congratulations before saying she had to get off the phone. Ultimately, Halima's only advice was for Ms. Gonzales to "woman up" and confront her supervisor directly—effectively shutting down any discussion of how expectations around availability and responsiveness might warrant adjustment in light of her pregnancy.

34.     When Ms. Gonzales followed up to clarify that she was four months pregnant and continued to raise concerns, Halima again deflected, offering only another perfunctory congratulations.

35.    At no point did Halima, the company's HR director, engage in any discussion about whether the situation might warrant accommodation, nor did anyone else at Corgan.    To the contrary, and as further detailed below, Corgan responded to Ms. Gonzales's pregnancy disclosure by swiftly revoking the flexibility she had previously been afforded, denying her further accommodations, and imposing stricter attendance demands not applied to her male or non-pregnant peers.

## CORGAN PUTS MS. GONZALES ON A PIP UPON LEARNING SHE'S PREGNANT

36.    On Thursday, August 10, 2023—just a couple days after disclosing her pregnancy to the company's director of HR—Corgan's "HR Business Partner," Hannah Cherner, summoned Ms. Gonzales out of the blue for a disciplinary "performance discussion" with Ms. Gonzales's direct supervisor, Brittany.

37.    Ms. Gonzales's so-called performance discussion with Brittany and Hannah was not a discussion at all—it was an ambush. Corgan delivered in-person notice of sudden and severe disciplinary action, citing alleged abuse of the FWE Policy and vague performance concerns. These justifications were plainly pretextual, surfacing only days after Ms. Gonzales disclosed her pregnancy and entirely at odds with her record of positive feedback and recent recognition.

38.    As memorialized in Corgan's formal Notice of Performance Improvement Plan issued later that day, Hannah and Brittany informed Ms. Gonzales during the meeting that she would be placed on a strict six-month "performance improvement plan" ("PIP"), effective the coming Monday, August 14, 2023. Beginning that date, Corgan's widely used FWE Policy would be revoked as to

Ms. Gonzales specifically, and Ms. Gonzales would be required to work in person from 7:00 a.m. to 4:00 p.m., Monday through Friday.

39.    Ms. Gonzales was the only member of the Marketing Department's Dallas office—if not the entire department—to be stripped of FWE privileges and forced into full-time, in-office work. She alone was required to come in an hour before the office even opened, and she alone was subject to a nine-hour workday. Meanwhile, her male and non-pregnant colleagues retained full use of the FWE Policy and were still expected to begin their workdays two hours later, at 9:00 a.m.

40.    In effect, Corgan imposed a harsher schedule and higher demands on the only visibly pregnant member of the team, reversing the flexibility it had previously promoted as a core workplace value for a six-month stretch of time set to extend beyond the birth of the child she was carrying.

41.    In addition to flatly denying Ms. Gonzales access to flexible work accommodations routinely extended to others for reasons far less significant than pregnancy, Corgan imposed burdens not applied to any of her male or non-pregnant colleagues by, for example, mandating Ms. Gonzales's full-time, in-office attendance for nine-hour workdays that began before the office even opened.

42.    The timing of Corgan's abrupt and punitive action—announced just days after Ms. Gonzales disclosed her pregnancy to the company's HR director while raising concerns about her direct supervisor—demonstrates that Corgan's disciplinary actions against Ms. Gonzales were triggered or at least in part motivated by discriminatory animus. Consistent with such animus, Corgan refused to engage or even consider engaging in measures to accommodate Ms. Gonzales's pregnancy.

Instead, Corgan took affirmative steps to shut down such discussions entirely and deny Ms. Gonzales workplace accommodations for her pregnancy.

## MS. GONZALES ENDURES ISOLATION UNDER PIP AND STILL DELIVERS

43.    Ms. Gonzales began reporting to work under the newly imposed PIP on Monday, August 14, 2023. The PIP was by no means a genuine effort to improve Ms. Gonzales's performance. It was instead a callous, punitive measure imposed against Ms. Gonzales to create a pretextual record for Corgan's discriminatory disciplinary measures, Corgan's denial of pregnancy accommodations to Ms. Gonzales, and ultimately, Ms. Gonzales's unlawful termination.

44.    From the outset, the conditions under the PIP were markedly harsher than those faced by any of her peers. She was required to report an hour before the office opened, barred from remote work, and subjected to a rigid nine-hour workday.

45.    In addition to these added burdens and restrictions, Ms. Gonzales was abruptly assigned an excessive volume of work. Despite the short timelines, Ms. Gonzales completed every assignment on time and maintained open communication throughout. She worked through lunch, stayed late, and skipped department activities to keep up.

46.    These conditions—imposed almost immediately after Ms. Gonzales disclosed her pregnancy—were not designed to support improvement. In fact, they were plainly at odds with Corgan's FWE Policy, which stressed the importance of collaboration and shared presence.

47.    Rather than foster collaboration or trust, however, the PIP that Corgan imposed on Ms. Gonzales was in direct opposition to the stated goals of its FWE

Policy: Ms. Gonzales was required to work alone in an empty office for two hours each workday, beginning before the office even opened.  Further stymying her ability to collaborate and develop rapport with her colleagues, Ms. Gonzales was restricted from speaking about her PIP with her coworkers because she was specifically instructed to keep the matter confidential.

48.     Additionally, because the PIP ominously threatened that "retaliation of any kind" by Ms. Gonzales would be grounds for her termination, it also effectively restricted Ms. Gonzales from speaking with her coworkers about her pregnancy or the needed accommodations she would have to go without if she wanted to keep her job—**for a period that Corgan set to extend beyond the ninth month of her pregnancy**. All the while, Ms. Gonzales's male and non-pregnant colleagues continued to enjoy full use of the FWE Policy without restriction.

49.     Notably, this does not appear to be the first time Corgan has resorted to the same playbook of excessive workloads and impossible deadlines in response to a protected disclosure:  In a separate sex discrimination lawsuit filed against Corgan, a female former employee similarly alleged that, after she disclosed her sexual orientation to coworkers, Corgan suddenly "gave [her] more job responsibilities on top of her current projects, making it impossible for her to adequately perform her work." *See* Plaintiff's Original Petition at ¶ 5.4, *Karian v. Corgan Associates, Inc.*, No. DC-21-04157 (44th Dist. Ct., Dallas County, Tex. filed Apr. 1, 2021).  More particularly, the female plaintiff in the *Karian* case alleged that Corgan put her "in charge of 12 different projects which included roles outside of her regular job duties" and that she was "forced to work late hours and complete projects with impossible deadlines," only

to be fired the next month. Although Corgan claimed that the *Karian* plaintiff's termination was part of a reduction in force, the company proceeded to post an opening for the same role just a few months later. *Id.* Corgan settled the case following the depositions of its managers and personnel.

### CORGAN FIRES MS. GONZALES FOR TWO-MINUTE "TARDINESS"

50. On August 22, 2023—just seven days into the PIP—Corgan terminated Ms. Gonzales's employment for the purported offense of arriving at her desk at 7:02 a.m.—just **two minutes** past her PIP-imposed early start time and just two minutes shy of **two hours** before her male and non-pregnant colleagues were expected to begin working or available for work.

51. Around noon that day, Ms. Gonzales was abruptly pulled into a closed-door meeting in which her supervisor Brittany, along with two of the company's HR managers, aggressively confronted Ms. Gonzales about her arrival time. Corgan disparaged Ms. Gonzales throughout the meeting, calling her 7:02 arrival to the office "insulting" and telling her that she did not deserve to work at the company.

52. Without being given any chance to respond, Ms. Gonzales was fired on the spot.

53. Upon notifying Ms. Gonzales of her termination, Corgan insisted that she immediately be escorted out of the building and even denied her the opportunity to retrieve her personal belongings. No warning preceded the decision, and no documentation or progressive discipline process was followed, despite Corgan's own written policies requiring both.

54.    Having failed to find any legitimate basis to terminate her after overloading her with high-volume, short-deadline work, Corgan instead seized on a two-minute discrepancy as bald pretext to terminate Ms. Gonzales employment after learning of her pregnancy.

## CORGAN'S POST-HOC RATIONALES DON'T ADD UP

55.    The exit documentation that Corgan subsequently issued to Ms. Gonzales listed two reasons for her termination: (1) alleged "abuse" of the Flexible Work Environment Policy, and (2) an alleged "violation of final warning on performance improvement plan."

56.    With respect to her alleged "abuse" of the FWE Policy, employees were only required to be available during core hours (9:00 a.m. to 4:00 p.m.) and to work a total of eight hours per day, which did not need to be consecutive.  Nothing in the FWE Policy or company handbook supported Ms. Gonzales's PIP-mandated arrival at 7:00 a.m., when no other team members were present and the office had not yet opened.

57.    The second stated basis for her termination—violating a "final warning" under the PIP—was also illegitimate.  Ms. Gonzales had arrived by or before 7:00 a.m. each day she had been subject to the PIP.  If there was any delay in reaching her desk, it was *de minimis* and did not affect her ability to work a full day, was outside of Corgan's normal operating hours, and was the result of reasonable pregnancy-related mobility issues, which should have been accommodated.

## MS. GONZALES'S COWORKERS REJECT CORGAN'S NARRATIVE

58.    Ms. Gonzales's coworkers were shocked to learn the details behind her termination and, in text messages to Ms. Gonzales, questioned the claims of performance issues that Corgan had asserted.  Such messages include:

- A colleague stating, "I have never complained about working with you … I feel like you had a great work ethic and are always so willing to help."

- A message stating that the justification for Ms. Gonzales's termination was "insane" and that she had never heard any peer or sector lead express concerns about Ms. Gonzales's performance.

- A colleague, upon learning the story, stating that she was "absolutely floored" by Corgan's actions.

- A colleague sharing that he was "disgusted" by Corgan's decision to terminate her based on alleged performance issues and acknowledging the pretextual nature of Corgan's justifications, stating to Ms. Gonzales, "They absolutely cannot fire you because of pregnancy."

59.    In addition, the Design Research Lead—whose missed calls to Ms. Gonzales were cited by Corgan as justification for the PIP—communicated that she was unaware of any legitimate concerns regarding Ms. Gonzales's performance, and even offered to serve as a reference for Ms. Gonzales after learning about the termination.

## MALE AND NON-PREGNANT EMPLOYEES GET A PASS FOR WORSE CONDUCT

60.    Ms. Gonzales was treated differently from other similarly situated, non-pregnant Corgan employees.  Ms. Gonzales was held to a far stricter standard than her male or non-pregnant peers when it came to both performance and use of the flexible work policy.  Examples of such disparate treatment include:

- A male employee who routinely worked from home three days per week and had missed several project deadlines, some of which allegedly caused Corgan to miss bid submission opportunities, yet she was never formally disciplined or placed on a PIP.

- After Ms. Gonzales was terminated, a male employee expressed concern about his job given that he regularly worked remotely and had exhausted his PTO; the employee was specifically told he was not at risk of being terminated or disciplined.

- A non-pregnant female employee missed a proposal deadline, but did not face any discipline; in contrast, Ms. Gonzales never missed a deadline, yet was placed on a PIP and subsequently fired shortly after disclosing her pregnancy.

- A non-pregnant female employee disclosed to Ms. Gonzales that she had missed multiple internal deadlines but faced no discipline.

- A non-pregnant employee consistently missed internal deadlines, and despite multiple complaints, remained at Corgan without discipline.

61.     Although Corgan accused Ms. Gonzales of violating policy by giving same-day notice in the WFH Chat, no steps were taken to discourage others in the Marketing Department from doing the same. In fact, colleagues continued posting day-of notices to work remotely as a daily occurrence. Corgan never raised concerns with those employees—only with Ms. Gonzales, and only after she disclosed her pregnancy.

**CORGAN HIRES A LESS EXPERIENCED MALE TO REPLACE MS. GONZALES**

62.     Corgan's decision to terminate Ms. Gonzales is further undermined by the timing and structure of her replacement. Within days of her termination, Corgan hired a male employee, Parker Blaylock, for a role titled "Marketing Coordinator"—*i.e.*, the same title Ms. Gonzales held prior to her dismissal.

63.     By the end of that same month during which Corgan fired Ms. Gonzales, Mr. Blaylock began working out of Corgan's Dallas office and was assigned to essentially the same workflow previously handled by Ms. Gonzales.

64.     Upon information and belief, Corgan's sudden or renewed focus on Mr. Blaylock's candidacy closely followed Ms. Gonzales's disclosure of her pregnancy; while Mr. Blaylock may have been considered earlier, it was only after Ms. Gonzales's disclosure of her pregnancy that decisionmakers moved to advance his candidacy and finalize his hiring.  Additionally, the timing and lack of transparency surrounding Corgan's hiring of Mr. Blaylock was carried out in a manner inconsistent with how similar roles were typically filled.

65.     Upon information and belief, Mr. Blaylock was assigned Ms. Gonzales's same desk, access credentials, and proposal queue shortly after his joining Corgan. At the same time, however, Corgan instructed employees internally to describe Ms. Gonzales's departure by using phrases like "structural adjustment," and began framing and instructing staff to frame Mr. Blaylock's hiring with euphemistic jargon like "workflow realignment" or "workflow coverage" in communications directed to Ms. Gonzales's then-former coworkers. Such jargon was deployed not to better inform, but to conceal, offering something like an explanation while quietly erasing the fact that Corgan had just replaced the only pregnant person in its Marketing Department.

66.     Consistent with this pattern of behavior, and upon information and belief, shortly after Ms. Gonzales disclosed her pregnancy to Human Resources, Corgan modified the pinned Teams WFH Chat instructions days after Ms. Gonzales's pregnancy disclosure to reflect post-hoc scheduling expectations; Corgan may have also taken other steps to suppress or overwrite internal records that had previously acknowledged Ms. Gonzales's approved flexibility.

67.     On its own and especially when coupled with Corgan's near immediate assignment of Mr. Blaylock to Ms. Gonzales's exact role, Ms. Gonzales's desk, and Ms. Gonzales's workflow, the timing of Corgan's hiring and outreach to Mr. Blaylock supports a strong inference that Ms. Gonzales's termination was not based on Corgan's business needs, but on Corgan's decision to replace Ms. Gonzales after she disclosed a protected status.

### Gonzales's Family Falls Into Crisis, and her Son Is Born into Hardship

68.     As a result of Corgan's discriminatory termination, Ms. Gonzales found herself facing the most stressful period of her life: pregnant, unable to provide for her family and meet basic financial obligations, and without access to health insurance.

69.     Ms. Gonzales was the breadwinner, and without her income, her entire family barely survived. She struggled to make mortgage and car payments. She and her husband began rationing food, and they had to rely on credit cards to cover basic necessities.  Ms. Gonzales's children had to quit extracurricular activities and forgo regular medical checkups because they no longer had affordable health insurance. Eventually, both children were enrolled in Medicaid, but the process took months, leaving them uninsured during that time.  Ms. Gonzales suffered from health issues, and her pregnancy was marred by stress.

## CAUSES OF ACTION

70.     Corgan's discriminatory actions give rise to the following causes of action under federal and state law.

### COUNT ONE:
### Pregnancy Discrimination in Violation of Title VII

71.    Plaintiff repeats and re-alleges the foregoing paragraphs as though fully set forth herein.

72.    At all relevant times, Plaintiff was an employee of Defendant and a member of a protected class under Title VII, including its amendment by the Pregnancy Discrimination Act of 1978. See 42 U.S.C. § 2000e(k).

73.    Defendant is an "employer" as defined by 42 U.S.C. § 2000e(b). Defendant intentionally discriminated against Plaintiff on the basis of her sex and pregnancy by subjecting her to disparate treatment in the terms, conditions, and privileges of employment.

74.    Such discriminatory conduct includes, but is not limited to: (a) revoking Plaintiff's flexible work privileges; (b) imposing a uniquely punitive, full-time, in-office schedule while pregnant; (c) subjecting her to excessive scrutiny and heightened expectations not applied to others; and (d) terminating her based on alleged conduct that did not warrant discipline under Defendant's written policies or established practices.

75.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered loss of income, benefits, emotional distress, mental anguish, and other compensable damages. Defendant's actions were intentional, malicious, and/or taken with reckless disregard for Plaintiff's federally protected rights.

## COUNT TWO:
### PREGNANCY DISCRIMINATION IN VIOLATION OF THE TEXAS LABOR CODE

76.    Plaintiff repeats and re-alleges the foregoing paragraphs as though fully set forth herein.

77.    Defendant is an "employer" under Chapter 21 of the Texas Labor Code, and Plaintiff is an "employee" entitled to protection under the statute, including under § 21.106, which prohibits discrimination on the basis of pregnancy, childbirth, or related medical conditions.

78.    Defendant subjected Plaintiff to unlawful discrimination in the terms and conditions of her employment because of her pregnancy. This discrimination includes heightened discipline, revocation of flexible work arrangements, imposition of a burdensome PIP, and termination on a pretextual basis.

79.    As a result of Defendant's violations, Plaintiff has suffered damages including but not limited to lost wages and benefits, emotional pain, inconvenience, mental anguish, and loss of enjoyment of life. Plaintiff is entitled to equitable relief and compensatory and punitive damages under Tex. Lab. Code §§ 21.258–.259, and 21.2585.

### COUNT THREE:
### DISCRIMINATION AND FAILURE TO ACCOMMODATE IN VIOLATION OF THE PREGNANT WORKERS FAIRNESS ACT.

80.    Plaintiff repeats and re-alleges the foregoing paragraphs as though fully set forth herein.

81.    At all relevant times, Defendant was a covered "employer" under the Pregnant Workers Fairness Act (PWFA), 42 U.S.C. § 2000gg(2), and Plaintiff was a covered "employee" under 42 U.S.C. § 2000gg(3).

82.    The PWFA requires employers to provide reasonable accommodations for known limitations related to pregnancy, childbirth, or related medical conditions, absent undue hardship.

83.     Plaintiff disclosed her pregnancy and requested to maintain the same flexible work schedule she had used successfully for the prior year. Instead of considering this request, Defendant imposed a full-time, rigid in-office requirement, shifted her start time to one hour before the office opened, and placed her under punitive scrutiny. These actions were taken without engaging in a good faith interactive process or evaluating potential accommodations.

84.     Defendant's conduct constitutes discrimination and failure to accommodate in violation of the PWFA. As a direct and proximate result of this conduct, Plaintiff suffered economic loss, emotional pain, and other damages recoverable under law.

## COUNT FOUR:
### RETALIATION IN VIOLATION OF THE PREGNANT WORKERS FAIRNESS ACT

85.     Plaintiff repeats and re-alleges the foregoing paragraphs as though fully set forth herein.

86.     The PWFA prohibits employers from retaliating against employees who request reasonable accommodations for limitations arising out of pregnancy or related conditions.

87.     Plaintiff's disclosure of her pregnancy and request to retain her existing flexible work schedule constituted protected conduct under the Act. In direct response, Defendant revoked those privileges, imposed an inflexible and burdensome performance plan, and terminated her just one week later.

88.    Defendant's actions were retaliatory and unlawful under 42 U.S.C. § 2000gg-1(3), and they caused Plaintiff to suffer damages including emotional distress, reputational harm, and financial loss.

## COUNT FIVE:
### HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII

89.    Plaintiff repeats and re-alleges the foregoing paragraphs as though fully set forth herein.

90.    Title VII prohibits an employer from subjecting an employee to a hostile or abusive work environment because of her sex, including pregnancy and pregnancy-related conditions. See 42 U.S.C. §§ 2000e(k), 2000e-2(a)(1).

91.    After Plaintiff disclosed her pregnancy, Defendant imposed materially harsher terms and conditions of employment.

92.    These actions created a hostile and objectively intolerable work environment for a visibly pregnant employee. The conduct was sufficiently severe and pervasive to alter the conditions of Plaintiff's employment and create an environment that a reasonable person in her position would find abusive, threatening, or humiliating. Plaintiff in fact perceived it as such.

93.    Defendant knew or should have known of the hostile environment and either participated directly or failed to take prompt remedial action.

94.    As a direct and proximate result of this hostile work environment, Plaintiff has suffered damages including emotional distress, loss of professional standing, and other compensable harm. Plaintiff is entitled to all remedies available

under Title VII, including compensatory and punitive damages, equitable relief, and attorneys' fees.

## COUNT SIX:
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

95.   Plaintiff repeats and re-alleges the foregoing paragraphs as though fully set forth herein.

96.   Defendant's conduct toward Plaintiff was extreme and outrageous. Knowing that Plaintiff was four months pregnant, Defendant placed her on a harsh six-month performance improvement plan that required daily early arrivals, no remote work flexibility, and extended hours—all while she was visibly pregnant and physically vulnerable.

97.   Defendant also prohibited Plaintiff from discussing the plan with coworkers, chilling her ability to speak openly about her pregnancy or seek moral or professional support. This confidentiality mandate prevented Plaintiff from advocating for accommodations or contextualizing her condition within the workplace, despite her legal right to do so.

98.   Defendant's decision to impose a lengthy and isolating disciplinary structure, paired with its directive to remain silent and its decision to fire her without warning over a two-minute deviation, was calculated to cause suffering, and it did.

99.   As a direct and foreseeable result of this outrageous conduct, Plaintiff suffered severe emotional distress, including anxiety, loss of self-worth, embarrassment, and fear for her health and pregnancy. Defendant acted intentionally or with reckless disregard for the emotional harm it caused.

## DAMAGES

100.    Reinstatement is not practicable, and Plaintiff has suffered actual damages in the form of past and future lost wages, lost fringe benefits, lost maternity-leave benefits, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses. Plaintiff is also entitled to contribution to her retirement account.

## ATTORNEYS' FEES

101.    It was necessary for Plaintiff to hire the undersigned attorney to protect her rights. Plaintiff is entitled to an award of attorneys' fees and costs pursuant to Texas Labor Code § 21.259.

## INTEREST

102.    Plaintiff is entitled to prejudgment and post judgment interest at the highest lawful rate.

## JURY TRIAL DEMAND

103.    Plaintiff demands a jury trial.

## PRAYER

104.    Plaintiff respectfully requests judgment against Defendant as follows:

    a.  A judgment declaring that the practices complained of herein are unlawful and in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq.; the Pregnant Workers Fairness Act, 42 U.S.C. § 2000gg et seq.; the Texas Employment Discrimination Act, as amended, Tex. Lab. Code §§ 21.001 et seq.; and any other cause(s) of action that may be inferred from the facts set forth herein;

    b.  All damages which Plaintiff has sustained as a result of Defendant's conduct, including back pay, front pay, general and specific damages for lost compensation, lost employment benefits, pecuniary and non-pecuniary losses resulting from Defendant's discriminatory and retaliatory practices, including but not limited to emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, and embarrassment;

    c.  All contractual or other wage-related damages to which Plaintiff is entitled, including any unpaid compensation or benefits owed;

    d.  Exemplary and punitive damages in an amount commensurate with Defendant's ability to pay and sufficient to deter future malicious, reckless, or intentionally unlawful conduct;

    e.  An award of all reasonable attorneys' fees, expert witness fees, court costs, and other costs incurred in connection with this action;

    f.  Pre-judgment and post-judgment interest, as provided by law;

    g.  That the Court retain jurisdiction over Defendant until such time as it is satisfied that Defendant has remedied the unlawful practices complained of and is in full compliance with applicable law;

    h.  Granting Plaintiff such other and further relief as this Court may deem just and proper.

105.   Plaintiff also seeks injunctive relief, including but not limited to:

    a.  Mandatory training on the subject of employment discrimination, pregnancy accommodations, and retaliation for all of Defendant's employees;

    b.  Diversity and anti-discrimination training for all supervisory and managerial staff conducted by qualified external professionals;

    c.  Disciplinary action, up to and including termination, for any supervisor or manager who has engaged in unlawful discriminatory conduct;

    d.  Active monitoring and reporting protocols within Defendant's workplace to ensure ongoing compliance with anti-discrimination and accommodation policies;

    e.  Oversight by the Court or an appropriate federal agency to ensure Defendant's full and continuing compliance with all injunctive relief ordered.

106.   Plaintiff further requests all such other legal and equitable relief as the Court may deem just, proper, and appropriate.

Respectfully submitted,

*/s/ Patrick M. W. Arnold*
Patrick M. W. Arnold
State Bar No. 24109596
parnold@wlbofirm.com
WALLS LANDRY BAKER & OLIVER, PLLC
5910 North Central Expy, Ste. 1560
Dallas, Texas 75206
(214) 265-1231 – Telephone
(972) 280-7634 – Facsimile

**ATTORNEY FOR PLAINTIFF
CYNTHIA J. GONZALES**